IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

DAVID ANDREW MARTINEZ,
EDMUND DESHAWN DENEILIOM,
RUBEN ALEJANDRO QUIROZ, CESAR
CASTELLANOS, LUCIO LERENZO
MENDOZA, SAMUEL TEWOLDE,
KALIN CARELL, and ANDREW
HILL-PICCOLA,

    Defendants.

No. CR 13-00794 WHA

**ORDER GRANTING IN PART
AND DENYING IN PART
MOTIONS TO SUPPRESS**

## INTRODUCTION

In this prosecution under RICO, VICAR, and other penal statutes, defendants have filed separate motions to suppress (1) evidence from the warrantless searches of cell phones; (2) evidence seized from the search of a defendant and his residence; (3) evidence from the seizure and search of a defendant and a car; and (4) an identification from a roadside cold show. Furthermore, one defendant has requested evidentiary hearings on two of his motions. To the extent stated, the motions are **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

The background of this action is set forth in prior orders (*see, e.g.*, Dkt. Nos. 72, 87). In brief, this is a non-capital criminal gang prosecution alleging seventeen counts against eight defendants. According to the indictment, nearly all defendants are connected to the Varrio South

Park gang, a Norteño group affiliated with the prison gang Nuestra Familia. Four defendants — Lucio Lerenzo Mendoza, Kalin Carell, Andrew Hill-Piccola, and Edmund Deshawn Deneiliom — have already pled guilty. As to the four remaining defendants, here are the pertinent facts.

### 1. DEFENDANT SAMUEL TEWOLDE.

On March 12, 2012, Santa Rosa police officers approached a group of men at an intersection, including defendant Samuel Tewolde, after receiving an anonymous call about possible drug sales there. When the officers approached the intersection, the group dispersed, but one of the officers recognized Tewolde from a police investigation the week before.

Knowing that Tewolde was on parole at the time, the officers stopped him in a green Honda, searched the Honda to find keys to another car, and found crack cocaine in the other car. The police then arrested Tewolde that day, later seizing and searching his cell phone. On March 19, 2012, the police searched his cell phone again. Another eight months passed before the police searched his cell phone on November 13, 2012, this time as part of an investigation into defendant Cesar Castellano's alleged crime of attempted murder. There was no warrant for any of these three cell-phone searches.

### 2. DEFENDANT CESAR CASTELLANOS.

On the night of October 9, 2012, Castellanos fought with "Victim 1" outside of a bar in Santa Rosa. Victim 1 was a known member of the Vario Santa Rosa Norte group, another Norteño gang. After the fight, Victim 1 left with two friends in a Honda Accord, and while they were stopped at a traffic light, Castellanos allegedly shot at the Honda Accord from an adjacent SUV, using a semi-automatic pistol wrapped in a black bandana. That SUV was reportedly driven by another individual, and carried a front-seat passenger as well as a potential fourth person in addition to Castellanos.

On December 11, 2012, Santa Rosa police officers obtained a state search warrant for Castellanos and his residence. Among other items, such as handguns, digital cameras, and electronic information stored within computers, the warrant authorized the search of "[a]ny cellular telephone devices and any information, contacts, photographs, text messages, images, videos or other data stored within the devices" (Wolf Exh. A at VSP-0004252).

Two days later, the police arrested Castellanos, at which point they searched him and took his iPhone. The police also executed a search of his residence later that day, seizing two more cell phones, a 9 mm Glock handgun, gun ammunition, gang paraphernalia, marijuana, and other items. The record does not indicate whether the police then searched any of the cell phones taken from Castellanos or his residence.

### 3. DEFENDANTS DAVID ANDREW MARTINEZ AND RUBEN ALEJANDRO QUIROZ.

At 11:48 PM on August 19, 2013, radio-dispatched descriptions of two men suspected of an armed robbery and shooting were broadcast. Specifically, the victims of the alleged robbery had described the suspect vehicle as a red Dodge Neon occupied by two suspects. The dispatch also reported that the suspects were "a heavyset Hispanic male wearing all black clothing, and a white male wearing a black sweater who was armed with a gun" (Taylor Exh. 1 at VSP-0000241). The dispatch further advised that the robbery had taken place at Occidental Road and Irwin Lane in Santa Rosa, though the victims later said that the robbery happened in a shopping center near Occidental and Irwin.

Shortly thereafter at 11:56 PM, a sheriff's deputy saw a red Dodge Neon with two occupants at River Road and Fulton Road in Santa Rosa, later stopping that vehicle at the West Steele Lane off-ramp on southbound Highway 101. There was no warrant for this stop. Then, at gunpoint, the deputy detained the vehicle's two occupants — defendants David Andrew Martinez and Ruben Alejandro Quiroz — ordered them out of the car, handcuffed them, and conducted a pat-down for weapons. In doing so, the deputy felt a hard object hidden in Martinez's pants that the deputy "suspected may have been a weapon," but which turned out to be Martinez's iPhone (*id.* at VSP-0000252). The deputy also found a glass methamphetamine pipe in Martinez's pants. No items were found and taken from Quiroz, other than cash, but two large trash bags full of marijuana were found inside the car at the scene (Young Exh. B at 10). Police reports later indicated that the trash bags contained approximately ten pounds of marijuana.

3

1    At 12:11 AM on August 20, 2013, another police dispatch advised that one of the victims had given a partial license plate identification of the red Dodge Neon allegedly involved in the robbery and shooting — 6JBU. At minimum, the "6JB" identification matched the first three digits of the red Dodge Neon that had been carrying Martinez and Quiroz — 6JBV620 (*id.* at 11).

Santa Rosa police officers then brought two of the victims from the scene of the alleged robbery to the West Steele Lane off-ramp, so that they could conduct a roadside cold show of Martinez and Quiroz. At hearing, the government represented (and defense counsel did not dispute) that this cold show took place less than an hour and a half after the initial dispatch. Specifically, one Santa Rosa police officer reported (Taylor Exh. 1 at VSP-0000242):

> I advised [the two victims] of the In-Field Line-up Admonishment and they stated that they understood. [The] deputies presented the two suspects one at a time. I asked [one victim] if he recognized either of the suspects. [He] stated that he recognized Quiroz. He stated that he recognized his grey and black sweatshirt, his hair, and his thin mustache. [That victim] stated that he could not positively identify Martinez as one of the two suspects.

The second victim, in contrast, could not positively identify either Martinez or Quiroz. The record also does not indicate what exactly was said as part of "the In-Field Line-up Admonishment" mentioned above.

The officers later took Martinez and Quiroz into custody, although the record is unclear as to the exact time that this occurred. The red Dodge Neon was also towed and inventoried. After Martinez and Quiroz were placed into custody, the police downloaded the contents of Martinez's iPhone and created a cell-phone examination report at around 1:40 AM that day. Again, there was no warrant for this cell-phone search.

Then at 2:45 AM, the police interviewed the victim who had recognized Quiroz during the roadside cold show. During that interview, the victim admitted that about five pounds of marijuana had been taken from him and his friends during the armed robbery. He also affirmed that the robbery was done by two men who fled in a red Dodge Neon, describing one suspect as "chubby, black hair, unknown facial hair, 5'-9'', 220–250 pounds, wearing a black sweatshirt and black sweat pants," and the other suspect as a man "with light skin, possibly wearing all

4

black . . . " (Taylor Exh. 2). The victim further commented on his identification from the roadside cold show, stating that "he was 90% sure the subject he identified was the suspect with the gun" in the robbery (*ibid.*).

### 4. THE PRESENT MOTIONS.

At issue are defendants' separate motions to suppress (1) evidence from the warrantless searches of cell phones; (2) evidence seized from the search of a defendant and his residence; (3) evidence from the seizure and search of a defendant and a car; and (4) an identification from the roadside cold show. One defendant also seeks evidentiary hearings on two of his motions.

The government opposes each of the above motions. Defendants, however, have not submitted any replies, despite a scheduling order permitting them to do so by August 1, 2014 (Dkt. No. 125). With that deadline now passed, and having considered the parties' briefing and oral argument at two separate hearings, this order decides all motions below.

## ANALYSIS

### 1. THE WARRANTLESS SEARCHES OF CELL PHONES.

Tewolde and Martinez have each filed motions to suppress evidence from the warrantless searches of their cell phones. Although Castellanos likewise moves for the suppression of cell-phone evidence, this order considers Castellanos' objections in the next section, with his motion to suppress other evidence seized from the search of his person and residence.

In a landmark ruling, the United States Supreme Court recently ruled that a warrant is normally needed to search cell phones, even when they are seized incident to arrest. *Riley v. California*, __ U.S. __, 134 S. Ct. 2473, 2484–86 (2014). Nevertheless, that landmark ruling is inapplicable to Tewolde because he was on parole and was subject to a parole search condition. "[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson v. California*, 547 U.S. 843, 857 (2006). In *Samson*, the police had been aware that the defendant was on state parole when they searched that defendant without a warrant, ultimately finding a cigarette box with methamphetamine inside. Because "parolees have fewer expectations of privacy than probationers," thereby rendering parole "more akin to imprisonment than probation is to imprisonment," the Supreme Court concluded that the

defendant had a "substantially diminished expectation of privacy" that society did not recognize as legitimate under the Fourth Amendment. *Id.* at 852, 855.

So too here. Section 3067 of the California Penal Code provides that "[a]ny inmate who is eligible for release on parole . . . shall be given notice that he or she is subject to terms and conditions of his or her release from prison," including "[a]n advisement that he or she is subject to search or seizure by a probation or parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause." In fact, Tewolde signed his own "Notice and Conditions of Parole," which stated the following search condition (McCutcheon Exh. A at VSP-0004312) (emphasis added):

> You and your residence and any property under your control may be searched *without a warrant* by an agent of the Department of Corrections or any law enforcement officer.

Moreover, according to a police report, the officers who arrested Tewolde "knew that [he] was on active parole" at the time, based on their contact the week before (McCutcheon Exh. B at VSP-0004283).

Given Tewolde's parole status and his express parole search condition, this order finds that the Fourth Amendment did not prohibit the search of his cell phone on March 12, 2012. Nor did the later two searches of that phone — on March 19, 2012, and on November 13, 2012 — offend the Fourth Amendment, as subsequent searches of an item may be conducted without a warrant "once [that] item . . . has been lawfully seized and searched" and "remains in the legitimate uninterrupted possession of the police." *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983). That is the situation here, as Tewolde's cell phone has remained in continuous police custody since his arrest (McCutcheon Decl. ¶ 2).

\*     \*     \*

But the analysis differs for Martinez, who was not on parole (so far as the record shows). The government contends that the warrantless search of Martinez's iPhone was lawful because it was reportedly a search incident to his arrest. But as to Martinez, *Riley* is now on point. A warrant is generally required to search cell phones, even ones seized incident to arrest, because cell phones contain "vast quantities of personal information literally in the hands of individuals."

6

*Riley*, 134 S. Ct. at 2485. *Riley* also noted that digital data does not present the same risks of harm to police officers and destruction of evidence, as does physical objects associated with the person of an arrestee.

The government nevertheless counters with two decisions. *First*, it points to *Davis v. United States*, 131 S. Ct. 2419, 2434 (2011), which provides a good-faith exception for "searches conducted in objectively reasonable reliance on binding appellate precedent." In those situations, the exclusionary rule does not apply. *Second*, the government cites *People v. Diaz*, 51 Cal. 4th 84, 93 (2011), a pre-*Riley* California Supreme Court decision that had permitted warrantless searches of a cell phone incident to an arrest so long as the phone was "immediately associated with [the defendant's] person." The government thus asserts that it was objectively reasonable for Santa Rosa police officers to have relied on *Diaz* and search Martinez's iPhone without a warrant.

This order need not decide whether *Davis* and *Diaz* apply in light of *Riley*, because on this record, the search of Martinez's iPhone was not incident to his arrest. After Martinez was placed into custody, the police downloaded the contents of his iPhone and generated a cell-phone examination report at around 1:40 AM that day. The government concedes this cell-phone search occurred "less than two hours after Martinez was arrested," but have not shown exactly how much time passed between Martinez's arrest and the later cell-phone search (Opp. 4).

*United States v. Chadwick*, 433 U.S. 1, 15 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1982), is instructive here. In *Chadwick*, police officers seized a footlocker at the time of an arrest, and then searched that locker approximately an hour later. *Chadwick* affirmed the decision to suppress the results of that search, explaining (internal citations omitted):

> [W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest" . . . or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

7

Of note, *Chadwick* distinguished itself from *United States v. Edwards*, 415, U.S. 800, 805 (1974), which had permitted a warrantless search of a suspect's clothes ten hours after his arrest. In doing so, *Chadwick* noted that "[u]nlike searches of the person . . . searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest . . . ." 433 U.S. at 16 n.10 (internal citations omitted). For that reason, this order is unpersuaded by the government's citation to *United States v. Cote*, 03CR271, 2005 WL 1323343, *6 (N.D. Ill. May 26, 2005) (Judge James B. Zagel), an out-of-district decision that had relied on *Edwards*' reasoning.

On the instant record, it is undisputed that the police seized Martinez's iPhone at the time of his arrest, brought him to the police station for booking, and then searched his phone. There were no exigent circumstances involved. In other words, there was no danger that Martinez might somehow access his phone once the police had placed him into custody and thus gained "exclusive control" over that phone. And while the record does not indicate precisely when Martinez was placed into custody, the government states that iPhone search "occurred less than two hours after Martinez was arrested" (Opp. 4). This is analogous to the situation in *United States v. Gibson*, CR 11-00734 WHA, 2012 WL 1123146, *10 (N.D. Cal. Apr. 3, 2012), in which the undersigned judge found that a cell-phone search occurring one to two hours after an arrest was not incident to that arrest. As such, evidence from the search of Martinez's iPhone will not be admissible against him in the government's case-in-chief.

**2.   THE SEARCH OF CASTELLANOS AND HIS RESIDENCE.**

Castellanos also moves to suppress evidence seized from the search of his person and residence. In his view, such evidence includes the iPhone taken from him at the time of his arrest, the two cell phones and other items taken from his residence, and information obtained from any searches of his three phones. Again, the record does not indicate whether the police actually searched those phones. Nonetheless, the government has presented copies of the state search warrant and appended affidavit, which authorized the search of Castellanos and his residence for (*see* Wolf Decl. ¶ 1; Exh. A at VSP-0004251–53; *and* Exh. B):

8

> 1) Any items tending to establish the identity of persons who have dominion and control of the location, premises, automobiles, or items to be seized . . . .
>
> 2) Evidence of gang membership [including] Norteno gang indicia specifically clothing, writing, objects, graffiti depicting gang participants names, logos, slogans, affiliation, activity, identity, drawings, photographs and photograph albums depicting persons, vehicles or weapons, or location which may appear to be relevant on the question of gang participation or association, or which may depict items believed to be evidence in the case being investigated with this warrant.
>
> 3) Any handguns. In addition to any handguns, any miscellaneous gun/firearm pieces, ammunition, gun-cleaning items or kits, holsters, ammunition belts . . . .
>
> 4) Any cellular telephone devices and any information, contacts, photographs, text messages, images, videos, or other data stored within the devices.
>
> 5) Any digital cameras and digital media storage devices that may contain digital photographs, images, or videos.
>
> 6) Search for "information" on all electronic data processing and storage devices, computers and computer systems . . . .

Castellanos now challenges the validity of the warrant on three grounds. *First*, he asserts that there was no probable cause to issue the warrant. Our court of appeals has stated:

> *We review the issuance of a search warrant by a magistrate judge for clear error*, in order "to determine whether the magistrate had a substantial basis to conclude that the warrant was supported by probable cause . . . ." This standard of review is "less probing than *de novo* review and shows deference to the issuing magistrate's determination . . . ." *Probable cause exists when, considering the totality of the circumstances, the affidavit shows that there is a "fair probability that contraband or evidence of a crime will be found in a particular place."*

*United States v. Fernandez*, 388 F.3d 1199, 1252 (9th Cir. 2004) (internal citations omitted) (emphasis added).

Under the totality of the circumstances here, this order holds that there was no clear error by the state judge in finding probable cause to search Castellanos or his residence for cell phones, cell-phone data stored therein, or other items listed in the warrant. In his nineteen-page affidavit appended to the warrant, Detective Travis Menke detailed his two-month investigation of the alleged shooting on October 9, 2012. For example, on the morning after the shooting, Detective Menke interviewed one of Victim 1's friends who had reported seeing Castellanos

9

fight with Victim 1 and then shoot at the Honda Accord later that night (with Victim 1 and the friend inside). That friend had also identified Castellanos as the shooter from a six-pack photo-lineup provided by Detective Menke, and surveillance-camera footage confirmed that Castellanos was at the bar on the night of the alleged fight. In addition, Detective Menke stated in the affidavit that he had experience investigating "well over 200 Gang, Property, Drug and Violent Crime related cases," and that he had seen photos, videos, and text messages from Tewolde's cell phone depicting Castellanos with VSP gang signs. In that connection, Detective Menke had talked to other gang detectives, learning the following (Wolf Exh. A at VSP-0004255–71) (emphasis added):

> *I know Castellanos to be an active Norteno Gang participant*. Castellanos has numerous prior contacts with known gang offenders . . . has gang related tattoos, has been contacted while in possession of gang paraphernalia, and has been observed wearing gang related clothing. Castellanos has also admitted gang participation in the past and I have also seen multiple gang related photographs of Castellanos.

Finally, Detective Menke explained in the affidavit that based on his experience as a gang investigator, he knew "that gang participants often store photographs of gang activity on their cell phones . . . telephone numbers and contact information for other gang participants," and further believed "that the cellular telephone also may contain photographs of the firearm or text messages referencing the firearm" associated with his investigation (*id.* at VSP-0004269). Given that Victim 1 was also a known gang member, these circumstances provided a substantial basis to conclude that there was a fair probability of finding evidence of the alleged shooting — a potential gang-related crime — either on Castellanos' person or at his residence.

*Second*, Castellanos claims that the information in the affidavit had gone stale. For support, he points to the approximate two months between the alleged shooting on October 9, 2012, and the issuance of the warrant and subsequent searches in December 2012.

This order disagrees. Some of the information contained in the affidavit was based on events as recent as mid-November 2012 to early December 2012. The affidavit, for instance, described how on December 4, 2012, Detective Menke installed a video camera to conduct

1 around-the-clock surveillance of Castellanos' residence and his vehicles (*id.* at VSP-
2 0004265–67).

3 Furthermore, "[s]taleness must be evaluated in light of the particular facts of the case and
4 the nature of the criminal activity and property sought." *United States v. Greany*, 929 F.2d 523,
5 525 (9th Cir. 1991). As described above, the affidavit detailed Detective Menke's ongoing
6 investigation of the shooting in connection with Castellanos' known gang ties. The affidavit
7 further stated that in Detective Menke's experience, gang participants "often store" photographs
8 of gang activity in their cell phones, "frequently" record evidence of potential gang crimes in
9 their letters, electronic media storage devices, and video records, and "maintain" scrapbooks of
10 newspaper articles that describe their crimes (Wolf Exh. A at VSP-0004268–69). It was thus
11 reasonable to conclude that in a span of only two months, evidence of a possible gang-related
12 shooting would still be found on Castellanos, at his residence, or in his cell phones.

13 *Third*, Castellanos attacks the warrant as overly broad and insufficiently particular with
14 respect to its "search for gang indicia." He contends that "[n]o reasonably well-trained officer
15 could believe that he could seize so wide a range of evidence relating to gang indicia without any
16 evidence that CASTELLANOS was wearing gang indicia during the shooting or yelled out any
17 gang slogans during the incident" (Br. 13, 14).

18 To determine whether a warrant is overly broad and insufficiently particular, "one or
19 more" of the following questions may be considered:

20 > (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out
21 > objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3)
22 > whether the government was able to describe the items more particularly in light of the information available to it at the time
23 > the warrant was issued.

24 *United States v. Adjani*, 452 F.3d 1140, 1148 (9th Cir. 2006) (internal citations omitted).

25 Here, even if Castellanos was not wearing any gang-related items or yelling any gang
26 slogans during the alleged fight and shooting, there was still evidence that those incidents were
27 gang-related. The affidavit documented how both a witness and surveillance-camera footage had
28 identified Castellanos in connection with those events, and how Victim 1 and Castellanos were

11

1  both known gang members.  More importantly, Castellanos allegedly committed what appeared

2  to be a drive-by shooting, while in the company of several other individuals in the SUV.  It was

3  therefore reasonable to infer that this was a gang-related shooting, such that there was probable

4  cause to seize gang-indicia evidence from Castellanos' person or residence.

5       Moreover, the warrant was sufficiently particular about gang-indicia items, providing

6  standards by which officers could differentiate between items subject to seizure and those that

7  were not.  In this connection, the warrant sought (Wolf Exh. A at VSP-0004252):

> Evidence of gang membership to include Norteno gang indicia specifically clothing, writing, objects, graffiti depicting gang participants names, logos, slogans, affiliation, activity, identity, drawings, photographs and photograph albums depicting persons, vehicles or weapons, or location which may appear to be relevant on the question of gang participation or association, or which may depict items believed to be evidence in the case being investigated with this warrant.

The affidavit, in turn, explained that it was Detective Menke's experience that "most street gang members . . . frequently write their names or monikers on walls, furniture, miscellaneous items or papers, both within and on their residences," and that "most gang members" kept photographs, news articles, and books depicting their gang signs, criminal activities, hangouts, and members' names and phone numbers (*id.* at VSP-0004267–68).  This order thus holds that the warrant and affidavit were sufficiently particular as to the items of gang indicia to be seized, objectively describing those items in relation to Castellanos' gang membership and the events of the alleged shooting.  *See Adjani*, 452 F.3d at 1148.

     In any event, the "good faith" exception would apply here.  *See United States v. Leon*, 468 U.S. 897, 923 (1984).  The warrant was not so facially overbroad or insufficiently particular as to preclude application of that exception.  The police's reliance on the state judge's determination of probable cause was also objectively reasonable.  Furthermore, there is no indication that Detective Menke acted dishonestly or recklessly in preparing his affidavit.  As such, the exclusionary rule does not bar evidence seized from the searches of Castellanos' person and residence, including information obtained from his cell phones in compliance with the warrant (*see* Wolf Exh. A at VSP-0004252).

12

### 3.  THE DETENTION OF QUIROZ AND THE SEIZURE AND SEARCH OF THE RED DODGE NEON.

Quiroz separately filed his own motion to suppress evidence. Specifically, he argues that his detention on August 19, 2013, constituted a warrantless arrest that lacked probable cause, and that the police unlawfully seized and searched the red Dodge Neon that he had been driving. As a result, Quiroz concludes that all evidence stemming from those events — "including any observations of law enforcement officers, and any statements of QUIROZ which are the product of the unlawful seizures and searches on that date" — should be barred (Br. 2). He also requests an evidentiary hearing on this motion.

Turning first to Quiroz's detention, the record shows that he was initially stopped while driving the red Dodge Neon. The government argues that no warrant was needed here because it was an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Quiroz contends that this initial stop was an arrest.

This order agrees with the government. "There is clearly no mechanical checklist to distinguish between *Terry* stops and formal arrest or the equivalent of arrest," but a judicial review:

> [T]urns on the particular facts and circumstances of each case. *When officers make a stop supported by reasonable suspicion, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.* A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest.

*United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1084 (9th Cir. 2000) (internal citations omitted) (emphasis added).

On this record, reasonable suspicion existed to stop Quiroz. His vehicle matched the one reported by the police dispatch — a red Dodge Neon with two suspects. The deputy then stopped Quiroz's car at 11:56 PM, only eight minutes after the dispatch in the middle of the night. Also important is the fact that the initial stop took place in the vicinity of the alleged robbery, after the deputy had elected "to search the area for the suspect vehicle" and identified Irwin Lane as "a likely avenue of escape for the suspects of the shooting" (Taylor Exh. 1 at VSP-

13

1  0000252). Although the parties dispute whether that route was in fact a "likely avenue of
2  escape," defense counsel conceded at hearing that it was at least a "plausible" escape route.
3  Given these facts, this was nothing more than an investigatory stop.

4  Nor was it an arrest when the deputy later ordered Quiroz out of the car at gunpoint and
5  handcuffed him thereafter. Our court of appeals has stated (and Quiroz recognizes) that
6  "pointing a weapon at a suspect and handcuffing him . . . will not automatically convert an
7  investigatory stop into an arrest that requires probable cause" (Br. 8). *See Washington v.*
8  *Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) (internal citations omitted). In *Gallegos v. City of*
9  *Los Angeles*, 308 F.3d 987, 990–92 (9th Cir. 2002), the defendant was mistaken for a suspect
10 who had reportedly tried to break into a house. The police stopped the defendant in his truck,
11 ordered him from the truck at gunpoint, handcuffed him, and placed him in the back of the police
12 car. Even so, *Gallegos* held that "[t]he detention was brief, calculated solely to make sure [the
13 police] had the right man," and that under those circumstances, the police had conducted an
14 objectively reasonable investigatory stop. *Id.* at 992–93.

15 So too here. As stated in his "Incident/Investigation Report," the deputy who had
16 ordered Quiroz from the red Dodge Neon and handcuffed him did so "[g]iven the fact that [the
17 deputy] was investigating a robbery and a shooting" (Taylor Exh. 1 at VSP-0000252). In the
18 wake of such reported crimes, and the circumstances described above in support of reasonable
19 suspicion, this order finds that the deputy's conduct was reasonably necessary to protect himself
20 and to secure Quiroz and his car during the investigatory stop. There was thus no arrest at this
21 point.

22 This order now turns to Quiroz's argument that the search of the red Dodge Neon was
23 unlawful because that search was not incident to an arrest. The key fact, however, is that the
24 police found a glass methamphetamine pipe on Martinez during the pat-down. Officers then had
25 probable cause to believe that the red Dodge Neon contained contraband, thereby justifying a
26 search of that vehicle and "every part of the vehicle and its contents that may conceal the object
27 of the search" under the "automobile exception" to the warrant requirement. *United States v.*
28 *Ross*, 456 U.S. 798, 825 (1982). This is especially true given that the red Dodge Neon was

14

1   operational and readily mobile. Accordingly, evidence from Quiroz's detention and the seizure
2   and search of the red Dodge Neon will not be suppressed on Fourth Amendment grounds.

3    This order further decides that there need be no evidentiary hearing on this motion. At
4   hearing, defense counsel specifically requested an evidentiary hearing on when exactly the red
5   Dodge Neon was searched. But as neither side disputes the fact that a glass methamphetamine
6   pipe was found during the pat-down, the moving papers are not "sufficiently definite, specific,
7   detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to
8   the validity of the search are in question." *United States v. Ledesma*, 499 F.2d 36, 39 (9th Cir.
9   1974).

   **4.**  **THE ROADSIDE IDENTIFICATION OF QUIROZ.**

11    Invoking due-process concerns, Quiroz has filed a motion to suppress the victim's "out-
12   of-court identification" from the roadside cold show, as well as any "in-court identification" that
13   may be provided by that victim. In Quiroz's view, the roadside cold show was unreliable and a
14   product of impermissibly suggestive pretrial procedure. He also seeks an evidentiary hearing on
15   this motion.

16    *Perry v. New Hampshire* has clarified the governing rule, stating that "[t]he due process
17   check for reliability . . . comes into play *only after* the defendant establishes improper police
18   conduct." __ U.S. __, 132 S. Ct. 716, 725 (2012) (emphasis added). Once that burden is met, a
19   district court then turns to whether the identification was reliable under the totality of the
20   circumstances, considering "the opportunity of the witness to view the criminal at the time of the
21   crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the
22   level of certainty demonstrated at the confrontation, and the time between the crime and the
23   confrontation . . . ." *Perry*, for instance, affirmed a defendant's conviction because "the
24   identification was not procured under unnecessarily suggestive circumstances arranged by law
25   enforcement," despite indications that the identification had taken place in a dark parking lot and
26   the witness was later unable to identify the defendant as the perpetrator.

15

The question thus presented is whether, under the totality of the circumstances, the roadside cold show was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). Quiroz argues that the answer is yes, because the police showed him and Martinez handcuffed next to a car that was similar to the vehicle used in the alleged robbery.

This order accepts that the police could have avoided putting Quiroz and Martinez right next to the red Dodge Neon had the police conducted the cold show away from the car. Even so, Quiroz has not shown such impermissibly suggestive police conduct that produced "a very substantial likelihood of irreparable misidentification." Indeed, our court of appeals has upheld a drive-by identification of a defendant where he was standing next to police officers and those officers were holding up a wig, baseball cap, and other items used during a reported bank robbery. *United States v. Jones*, 84 F.3d 1206, 1210 (9th Cir. 1996). In doing so, *Jones* stated (internal citations omitted) (emphasis added):

> The circumstances of the drive-by identification were clearly suggestive. Other than the taxi driver, Jones was the only civilian presented for identification. *He was surrounded by police officers who were holding up several items found in the back of the cab which matched the disguise worn by the bank robber*.
>
> \*   \*   \*
>
> *We have previously upheld suggestive procedures, recognizing the benefit of permitting witnesses to make an identification while the image of the perpetrator is still fresh in their minds* . . . . As we noted in *Kessler*, "where the procedure employed does not give rise to 'a very substantial likelihood of irreparable misidentification,' identification evidence is for the jury to weigh . . . ." In light of the factors considered above, *we conclude there was not a substantial likelihood of misidentification by the witnesses' curbside identification of Jones*.

Similarly in *United States v. Kessler*, 692 F.2d 584, 585 (9th Cir. 1982), it was not impermissibly suggestive for the police to bring a handcuffed defendant to a witness — back at the scene of the alleged crime and accompanied by a large number of officers — even where the police had referred to the defendant as the "suspect." *See also United States v. Drake*, 543 F.3d 1080, 1083 (9th Cir. 2008).

16

At most, the record shows that the police brought the two victims to identify Quiroz and Martinez while these defendants were handcuffed next to the red Dodge Neon. "The use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses." *Kessler*, 692 F.2d at 585–86. Furthermore, while no other suspects were present, the victims would have already assumed that the police had stopped two people in a red Dodge Neon, based on what was communicated to dispatch earlier. Seeing Martinez and Quiroz next to that vehicle was thus not overly suggestive in and of itself. In addition, one officer gave the victims "the In-Field line-up Admonishment" prior to the cold show, and the victims stated that they understood the admonishment (Taylor Exh. 1 at VSP-0000242). The police then presented Quiroz and Martinez one at a time, after which one victim stated that he recognized Quiroz because of "his grey and black sweatshirt, his hair, and his thin mustache" (*ibid.*). Under these circumstances, this order finds that Quiroz has not met his burden to show that the cold show was so impermissibly suggestive. It is thus unnecessary to reach his arguments about the reliability of that identification. *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

Nevertheless, Quiroz claims that any "in-court identification" by the victim should be barred on irrelevance, FRE 403, reliability, and due-process grounds. The nub of his claim is that the victim's out-of-court identification was speculative, as the victim reportedly said in his later interview that he was "not sure" about his identification of Quiroz (Br. 2). In reality, the interview video shows that the victim said (Taylor Exh. 2) (emphasis added):

> I kind of recognized the first person they showed me, *but I'm not really that sure . . . . He looked like the guy that had the gun. He was chubby and kind of like a little taller than me, like 5' 10''*.

In any event, this order agrees with the government and holds that any in-court identification by the victim should be addressed via cross-examination, not a motion to exclude. Moreover, although Quiroz vaguely claims that the roadside cold show "was not recorded and it is unknown what was said to [the victim] or what [the victim] actually told the police about [his] identification," this order will not hold an evidentiary hearing absent detailed, factual issues

presented by the moving papers with respect to the victim's identification (Br. 7). *Ledesma*, 499 F.2d at 39.

## CONCLUSION

To the extent stated above, the motion to suppress evidence from the search of Martinez's iPhone is **GRANTED** — this evidence may not be usable against Martinez in the government's case-in-chief. The other defendants, however, are not entitled to such suppression simply because the government is barred from using that evidence in its case-in-chief against Martinez. All other motions and requests for an evidentiary hearing are **DENIED**.

**IT IS SO ORDERED.**

Dated: August 12, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE